**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ernest BOLTON, Defendant–Appellant.**

**No. 91–2653.**

United States Court of Appeals,
Seventh Circuit.

Argued May 20, 1992.

Decided Oct. 22, 1992.

---

**6.** Judge Parsons did not give the disability determination preclusive effect, and the EPA does not argue that we should.

Barry R. Elden, Ross O. Silverman, Asst. U.S. Attys., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Constantine J. Gekas, Harvitt & Gekas, Chicago, Ill., for defendant-appellant.

Before CUDAHY and EASTERBROOK, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

CUDAHY, Circuit Judge.

For a price—a pack of cigarettes, a few pastries or as little as ten dollars—Ernest Bolton, an inspector for Chicago's Consumer Services Department, was apparently prepared to turn a blind eye to health code violations, real or threatened. After a four-day trial, a jury convicted Bolton of three counts of extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (1988), and one count of RICO conspiracy, 18 U.S.C. § 1962(d) (1988). Bolton appeals, contending that the government improperly used his immunized testimony, that the prosecution withheld exculpatory evidence and that the district court improperly admitted evidence. We affirm.

I.

In 1984 and 1985, Bolton worked as a health inspector for the City of Chicago's Consumer Services Department. The job required that Bolton inspect various food establishments around the city, report violations and issue tickets when appropriate. Bolton's supervisor was Charles Watson,

who often accompanied Bolton on inspections. Together, Bolton and Watson allegedly solicited bribes from store owners and restaurateurs. Watson was charged with conspiracy to commit extortion and extortion; he pled guilty and agreed to cooperate with the government's investigation.

The procedural history of Bolton's prosecution is rather complex. On February 3, 1987, a grand jury returned a second superseding indictment charging Bolton with racketeering and extortion. After an eight-day trial, the jury found Bolton guilty of racketeering conspiracy and extortion and not guilty of attempted extortion. Bolton appealed from that conviction, arguing that the indictment must be dismissed because the grand jury's term had expired.

While Bolton's first appeal was pending, the government subpoenaed Bolton to testify before a federal grand jury investigating corruption in the Consumer Services Department. Bolton invoked his Fifth Amendment rights, and the prosecution was forced to apply for an order compelling Bolton's testimony under a grant of immunity. 18 U.S.C. § 6002 (1988). Judge Grady was concerned about the possible impropriety of compelling Bolton's testimony while his conviction was under appeal but nonetheless granted the petition. When Bolton came before the grand jury, the government asked Bolton about wrongdoing by other health inspectors but also asked him about his own involvement in bribery and extortion. In response to the latter questions, Bolton denied that he had ever taken or solicited bribes.

We then reversed Bolton's first conviction and remanded with instructions to dismiss the indictment. *United States v. Bolton*, 893 F.2d 894, 895 (7th Cir.1990). Soon after, another grand jury returned a third superseding indictment against Bolton. But this indictment was obtained by Assistant United States Attorney (AUSA) Helene Greenwald, who had attended the grand jury investigation and heard Bolton's testimony. Upon protest by defense counsel, the government conceded error, dismissed the indictment, "sanitized" Bolton's

file and reassigned the case to another AUSA who was not involved in the earlier investigation. Finally, on July 25, 1990, the grand jury returned a *fourth* superseding indictment against Bolton charging him with one count of racketeering conspiracy and seven substantive Hobbs Act violations.[1] The charges in the fourth superseding indictment were identical to those in earlier indictments.

Bolton moved to dismiss the case based on the government's alleged use of his immunized testimony in obtaining the latest indictment. The district court denied the motion, noting that the evidence presented in Bolton's first trial was a sufficient independent basis for the second prosecution. Nonetheless, Judge Norgle offered to reconsider the issue after the trial, should the evidence actually presented turn out to be infected by the immunized testimony. On May 8, 1991, a jury trial began against Bolton on the fourth superseding indictment. The trial involved six incidents in which Bolton allegedly demanded bribes from store owners. The evidence produced at trial consisted of the testimony of the shopkeepers involved, the testimony of Charles Watson and inspection reports filed by Bolton.

The jury convicted Bolton on one count of conspiracy and three counts of extortion, and acquitted him on one count of extortion (two of the incidents of extortion were not presented to the jury as separate crimes). After the trial, Bolton did not ask for a hearing or further ruling regarding the use of his immunized testimony. The district court sentenced Bolton to concurrent sentences of one year and a day on each count. Bolton now appeals his conviction.

## II.

### A. *Use of Immunized Testimony*

■ The immunity statute, section 6002, is supposed to provide "a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a wit-

---

1. Three of the Hobbs Act charges were later dismissed as time-barred.

ness as a result of his compelled disclosures." *Kastigar v. United States*, 406 U.S. 441, 460, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972) (footnote omitted). Once a defendant demonstrates that he has testified under immunity, the government bears the burden of showing that its evidence "is not tainted by establishing that [it] ha[s] an independent, legitimate source for the disputed evidence." *Id.* (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 1610 n. 18, 12 L.Ed.2d 678 (1964)). Bolton argues that the district court erred in denying his motion to dismiss the indictment because the government used his immunized grand jury testimony in violation of *Kastigar*'s "sweeping proscription of any use, direct or indirect, of the compelled testimony and information derived therefrom." *Id.* Bolton asks us to reverse his conviction and remand for a *Kastigar* hearing.

The evidence presented at the first trial could not have been tainted by Bolton's subsequent immunized testimony. The earlier evidence was a legitimate independent basis on which the second prosecution could go forward. *United States v. Pantone*, 634 F.2d 716, 721 (3d Cir.1980). Of course, the second prosecution might have turned out to be tainted by the use of Bolton's testimony, and the district court expressly offered Bolton an opportunity to make that argument when the trial was over. But Bolton did not avail himself of the opportunity and has thus waived this argument on appeal.

If we were to reach the merits, it is unlikely that Bolton's argument would succeed. Bolton's testimony before the grand jury consisted entirely of denials of wrongdoing and assertions that the witnesses at the first trial had lied. This testimony cannot have been much help to the prosecution. Bolton has a more plausible claim that knowledge of the denials may have affected the prosecution's strategy. But we recently held in *United States v. Velasco*, 953 F.2d 1467, 1474 (7th Cir.1992), that "the mere tangential influence that privileged information may have on the prosecutor's thought process in preparing for trial is not an impermissible 'use' of that

information." *Velasco*, 953 F.2d at 1474; *see also United States v. Serrano*, 870 F.2d 1, 16–18 (1st Cir.1989); *United States v. Mariani*, 851 F.2d 595, 600–01 (2d Cir. 1988), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989); and *United States v. Byrd*, 765 F.2d 1524, 1529–32 (11th Cir.1985). *But see United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir.1973) (prosecutor exposed to a defendant's immunized testimony confronts an "insurmountable task" of proving that he "did not use it in some significant way short of introducing tainted evidence"); and *United States v. North*, 910 F.2d 843, 856–60 (D.C.Cir.1990) (per curiam) (noting problems with defining "non-evidentiary use" and expressing doubt that statute permits non-evidentiary use), *modified on other grounds, United States v. North*, 920 F.2d 940 (D.C.Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991)). In any event, we doubt that even a "tangential influence" is present here, since the two AUSAs who handled the second trial had, at most, indirect contact with the earlier investigation. *Byrd*, 765 F.2d at 1531–32 (problems posed by *McDaniel* may be avoided by reassigning the case to another prosecutor); *North*, 910 F.2d at 860 (noting efforts by independent counsel "to prevent untoward exposure or use by his staff").

### B. *Missing Photographs*

■ At the first trial, several of Bolton's victims were unable to identify him in the courtroom. Accordingly, the government had to rely on evidence that on earlier occasions the victims had identified Bolton from photographs. During the investigation, the FBI used a book of black and white photographs of the Chicago health inspectors, a similar book of color photographs (obtained because the black and white photographs were of poor quality and did not facilitate identification) and a number of six-man photo spreads. All of the victims were shown both photo books. Some victims were also shown one or more six-man spreads.

At some point during the first trial, Bolton learned that three of the photo spreads shown to the victims (labelled AA, BB and CC) were missing. After Bolton's conviction was reversed and the government decided to re-prosecute, Bolton's counsel made several explicit requests for the production of the missing photo spreads. The government complied with none of the requests.[2]

During the second trial, the prosecution called FBI Agent David Steele to the stand to testify about some of the out-of-court identifications by the victims. At this point Bolton's counsel, Constantine Gekas, notified the court that he intended to cross-examine Agent Steele with the suggestion that some photo spreads were missing. Given his proposed line of questioning, Gekas did not want the missing photo spreads to turn up unexpectedly. One of the prosecutors, AUSA Schneider, offered in return to go down to his office and retrieve the photo spreads, expressing to the court his wish that Gekas had asked for the spreads earlier.[3] Further, with Gekas' plan in mind, the prosecution also decided to bring out Agent Steele's use of spreads AA, BB and CC on direct examination.

While the other prosecutor conducted the direct examination of Agent Steele, Schneider retrieved the photo spreads. When the prosecution attempted to introduce the spreads into evidence, Gekas objected. The judge sustained the objection. But Gekas also wanted to use the spreads on cross-examination, and he couldn't have it both ways. The district judge denied Gekas' motion for a fifteen minute continuance to examine the spreads and demanded that Gekas decide whether the spreads were to be in or out. Gekas withdrew his objection and later cross-examined Agent Steele about his use of the spreads.

Not surprisingly, this series of events gives rise to numerous claims of error. Bolton claims that the prosecution violated Rule 16 of the Federal Rules of Criminal Procedure, Rule 2.04 of the Rules of Criminal Procedure for the United States District Court for the Northern District of Illinois and its duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose exculpatory evidence. Further, he claims that the judge compounded these problems by denying his counsel a continuance.

Although Bolton raises troubling questions about the conduct of the prosecution, we need reach none of his arguments. There is no indication that the missing photo spreads were shown to any alleged victim other than to a shopkeeper named Yousef Bader. The jury acquitted Bolton of extorting money from Bader. Any error was therefore harmless.

### C. *Mistaken Identification*

■ Bolton makes the further argument that the identification process as a whole was impermissibly suggestive. The witnesses were shown photo spreads containing his picture and photo books with his picture. Bolton argues that the FBI interviewed witnesses over and over, showing them different sets of pictures each time which had only one common element: Bolton's face. He notes that the FBI did not conduct a lineup, although a lineup could have been arranged.

Bolton made motions to suppress the identifications to Judge Williams, to whom the case was first assigned, and to Judge Norgle, who presided over the trial.[4] Both judges reviewed the photo spreads and the photo books. Judge Norgle also reviewed the transcripts from the first trial, where Bolton had ample opportunity to cross-examine witnesses on the identification proce-

---

**2.** The reasons for the government's failure to produce are unclear. There is some indication that the AUSA in charge of the prosecution believed that all of the photo spreads had already been produced.

**3.** We trust that the irony of this comment is not lost on the reader.

**4.** Apparently, Bolton also made a motion before Judge Getzendanner, who had the case briefly. Judge Getzendanner denied the motion without comment.

dures used. Judge Williams concluded that the identification procedures were not impermissibly suggestive. Mem.Op. and Order at 2 (Jan. 13, 1987); *see Kubat v. Thieret*, 867 F.2d 351, 357 (7th Cir.) (court need not decide whether identifications are reliable if procedures are not suggestive), *cert. denied*, 493 U.S. 874, 110 S.Ct. 206, 107 L.Ed.2d 159 (1989). Judge Norgle went somewhat further in the analysis and concluded that the identifications were not "so unreliable as to raise a substantial likelihood of misidentification." Order (Nov. 27, 1990) (citing *Manson v. Brathwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977), and *Kubat*, 867 F.2d at 357).

Generally speaking, the jury can intelligently weigh the reliability of a questionable identification. *United States v. Duprey*, 895 F.2d 303, 308 (7th Cir.1989), *cert. denied*, 495 U.S. 906, 110 S.Ct. 1927, 109 L.Ed.2d 291 (1990) (citing *Manson*, 432 U.S. at 116, 97 S.Ct. at 2254). A district court should remove the evidence from the jury's consideration only if the identification is so unreliable that the jury is likely to be misled. *See Manson*, 432 U.S. at 111–12, 97 S.Ct. at 2251–52 (doctrine reflects Court's concern that eyewitness testimony convinces juries but is often unreliable). Although the admissibility of an identification is treated as a due process question, it is also an evidentiary decision, and the judgment of the district court is accordingly subject to deferential review. *United States v. Myers*, 892 F.2d 642, 646–47 (7th Cir.1990); *see also Manson*, 432 U.S. at 113–14, 97 S.Ct. at 2252–53.

As it turns out, the FBI showed more than one set of photographs to only two of the alleged victims, Yousef Bader and Jose Galvan. Since the jury acquitted Bolton of extorting money from Bader, we need only consider Galvan. Notably, Bolton was not charged with extorting money from Galvan. Instead, Galvan's testimony was offered in support of the racketeering conspiracy charge.

If we assume, without deciding, that the government's decision to show Galvan a number of sets of photographs with recurring images of Bolton was impermissibly suggestive, the question is whether the circumstances surrounding Galvan's choice of Bolton created "a very substantial likelihood of ... misidentification." *Manson*, 432 U.S. at 116, 97 S.Ct. at 2254. This question requires us to weigh the likelihood that Galvan could make an accurate identification against "the corrupting effect" of the suggestive procedure. *Id.*

Galvan's identification of Bolton was not as solid as it might have been, but the five factors set out in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972) indicate that there was some reason to believe that Galvan's identification could be reliable. First, Galvan had ample opportunity to observe Bolton at the time of his alleged crimes. Second, he was likely to focus on the man demanding bribes. Third, so far as we know, Galvan gave no prior descriptions of Bolton to be weighed against his identification. *See Kubat*, 867 F.2d at 358–59 n. 5. The fourth and fifth factors weigh against the admission of the evidence: Galvan's identification was tentative, and he did not pick Bolton out of a photo spread until more than a year after the incident.

Although the relative weakness of the identification might have led to a different result in another case, in this case it must be weighed against an identification procedure that was not very suggestive. Bolton would have us suppose that Galvan picked his picture out of the six-man photo spread because his was the only picture that Galvan had seen before. But Galvan had seen pictures of Bolton many months earlier, among 80–odd black and white photos and 50–odd color photos. Under the circumstances, it was reasonable for the district court to conclude that Galvan's familiarity with Bolton's face had more to do with Galvan's unpleasant encounter with Bolton than with his exposure to the photo books.[5]

---

5. It is worth noting that Galvan did not identify Bolton at trial. Further, the jury was told that Galvan only tentatively identified Bolton from the photo spread. To the extent that the identification was unreliable, the jury is unlikely to have given it more weight than it deserved.

### D. *Best Evidence*

 To corroborate the testimony of the victims and of Charles Watson, the prosecution introduced inspection reports, signed by Bolton, indicating that he had visited the establishments in question on the given days. At some point between the first trial and the second, the prosecution lost the originals of some of these reports and was forced to rely on copies. The copies had a flaw—they were missing the middle third of the original report.

Judge Norgle did not allow the prosecution to put these copies into evidence until it came up with an explanation for the missing portions of the originals. The government presented the testimony of Keith Pannaralla, the former Chief Consumer Services Officer at the Department of Consumer Services. Pannaralla explained that the inspection forms were too long to fit onto the Department's copier. Accordingly, it was standard practice to fold the reports so that the top and bottom of the report came into view. Since the bottom of the report contains the inspector's written description of any violations checked off in the middle section, the partial copies presumably contain all of the information in the originals. Bolton did not even suggest that he filled out the middle and bottom sections of his reports differently. Accordingly, the court did not abuse its discretion by admitting the copies.

### III.

For the foregoing reasons, the judgment of the district court is AFFIRMED.