In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2074

United States of America,

Plaintiff-Appellee,

v.

Sheila Britton,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 00 CR 50003-2--Philip G. Reinhard, Judge.

Argued November 7, 2001--Decided May 8, 2002


   Before Flaum, Chief Judge, and Posner and
Kanne, Circuit Judges.

   Kanne, Circuit Judge.  Defendant Sheila
Britton was convicted of multiple counts
of mail fraud arising from her use of
client funds for her personal benefit.
She appeals, arguing that (1) there was
insufficient evidence to support her
conviction, (2) the district court erred
in denying her attorney's motion to
withdraw, and (3) the district court
improperly refused to let her sister
testify as an expert. We affirm.

I.  History

   Sheila Britton and her husband Dan owned
and operated a collection agency in
Rockford, Illinois known as Commercial
Collection Company, Inc. ("CCC").
Businesses hired CCC to collect debts
owed to them, and CCC retained a
percentage commission on the amounts that
it collected. In addition to commissions
on payments made directly to CCC, CCC was
also entitled to receive commissions on
payments that debtors sent directly to
CCC clients ("direct payments"). When
clients received direct payments,
theynotified CCC of these payments so
that CCC could account for them and then
deduct the appropriate commission.

   CCC initially had two separate bank

accounts: an operating account and a trust account. Eventually, CCC stopped using the operating account, and all deposits and disbursements were made into and from the trust account. Payments received from debtors were deposited into the trust account and recorded into CCC's computer system. At the end of each month, CCC's computer system generated a "Statement of Collection" for each of its clients for whom money had been collected that month. The Statements showed the net amounts due to the clients after CCC's commissions were deducted. The Statements were then supposed to be sent to the client along with a check for the amount due in order for clients to know their financial standing with CCC.

Britton's responsibilities at CCC initially consisted of bookkeeping while Dan operated CCC. Specifically, she was the person primarily responsible for entering payments from debtors into CCC's computer system. Eventually, Britton assumed more responsibilities at CCC and began managing CCC's daily business. During this time, Britton supervised employees, met with clients, and personally reviewed and delivered Statements and checks to several major clients. By early 1996, Britton informed CCC's employees that she, and not Dan, was running CCC.

At the same time, Britton and her husband began using funds belonging to CCC's clients to pay for various personal and business expenses. For example, Britton took cash to "run an errand," to purchase a gift for her son or daughter, and to take her children to a local festival. Further, Britton and her husband regularly wrote checks on CCC's trust account to pay for their personal expenses, including a trip to Walt Disney World and a trip to Mexico. Britton also used CCC trust account funds to pay her mortgage on her personal residence, to pay for her lawn maintenance bills and landscaping, and to pay for her salon expenses.

Due to the Britton's extensive use of clients' funds, by 1996, there were insufficient funds in CCC's trust account to pay the clients the amounts they were owed. Britton and her husband thus ceased paying many of CCC's clients. Although they had stopped paying these clients,

CCC continued to collect on these clients' accounts because debtors continued to mail their checks to CCC for debts owed to these clients. From August 1995 through November 1996, CCC's internal records established that CCC owed several clients a total of over $21,000, but had paid clients only $739.02. In 1997, CCC failed to pay clients over $32,000 that was due to them.

Britton and her husband were charged with twenty-three counts of mail fraud in violation of 19 U.S.C. sec. 1341 and with one count of defrauding a local government agency that received federal funds in violation of 18 U.S.C. sec. 666 (a)(1)(A)./1 On November 17, 2000, approximately two and one-half weeks before the scheduled start of the trial, Britton filed a motion to continue the trial date in order to allow second-chair defense counsel Christopher A. DeRango to withdraw. The motion stated that DeRango had a conflict of interest in that he had previously represented a government witness named Bruce Swanson.

On November 22, 2000, Britton's motion was initially presented to the district court. The district court heard the parties' arguments and indicated that it was inclined to deny the motion and to rule that DeRango could continue on the case, except that he would not be allowed to participate in the cross-examination of Swanson. DeRango then requested an opportunity to make an in camera proffer to the court, and later that same afternoon, the court heard DeRango's proffer. This proceeding was off the record. On November 27, 2000, the parties reappeared before the district court on the same issue. The judge cleared the courtroom and then gave DeRango an opportunity to repeat on the record the proffer he had given to the court on November 22.

After the courtroom was cleared, DeRango stated the following: Swanson had admitted stealing $500 in cash from CCC during a pre-trial interview with the FBI and when he testified before the grand jury. During their preparation for trial, Britton and DeRango had discussed Swanson's potential testimony, including those admissions. Britton had stated that Swanson had admitted to her that the

reason he had stolen cash from CCC was to pay his legal bills. DeRango then realized that he had previously represented Swanson while DeRango worked at another law firm. This statement prompted DeRango to obtain permission from his prior firm to view Swanson's billing records. After he reviewed those records, DeRango determined that he had received in excess of $1,200 in cash from Swanson. Thus, DeRango concluded that he possessed information that could be used to impeach Swanson about the amount of money he had taken and that he should be permitted to withdraw in order to testify about these payments.

The district court allowed the other attorneys to return to the courtroom and denied Britton's motions for continuance and for withdrawal. The court initially ruled that because the potential impeachment material related to a billing record, it was not covered by the attorney-client privilege. The court noted that defendant's lead counsel, Daniel Cain, could obtain this record with a trial subpoena. Additionally, in order to avoid the "appearance of impropriety" presented by an attorney cross-examining his former client, the court held that DeRango would not be allowed to participate in the cross-examination of Swanson or to disclose any information related to the billing record.

Trial began on December 5, 2000, and Britton conceded that CCC had failed to make all the required payments due to clients. The disputed issues consisted of the extent of that failure and whether Britton's actions were due to lack of business experience or whether they were due to a fraudulent intent. Initially, the government showed that Britton was aware that CCC had experienced serious overdrafts in its trust account. CCC employees testified that although debtors sent payments into CCC, the clients' portion of that money was not remitted. Several employees testified that the checks that clients did receive were returned by the bank for insufficient funds. The government also argued that Britton knew clients were not being paid because the Statements of Collection with the attached checks remained in her possession instead of being distributed to clients. Swanson testified that he saw several months worth of Statements and

checks in Britton's possession and urged her to issue them to clients. Swanson testified that they were never issued.

Dorothy Kerestes testified concerning Britton's fraudulent intent. Kerestes stated that she was a former CCC employee with approximately twenty years of experience in the collections field. Kerestes testified that she confronted Britton about a paycheck that she had received that was drawn on the CCC trust account. Kerestes explained to Britton that the funds in the trust account belonged to clients, not to Britton. According to Kerestes, Britton responded that the money was Britton's money to spend.

CCC's accountant testified concerning discrepancies in CCC's bank accounts that showed that Britton was not delivering to clients checks issued by CCC's computers. Various government witnesses also testified that clients called CCC to complain that they were not receiving their checks and that the checks they had received had bounced. The government presented testimony that showed that despite Britton's knowledge that clients were not being paid, Britton continued to spend large amounts of client funds on her own personal expenses. For example, the evidence established that trust account funds had paid more than $21,000 on Britton's personal credit cards, $6,000 for furniture, $4,000 on carpeting, and more than $18,000 in cash withdrawals. Further, the evidence showed that although CCC closed in early 1998, CCC continued to collect more than $40,000 in client collections but failed to make a single payment to any of CCC's clients. Testimony also established that Britton continued to mail CCC collection bills to debtors ("payment cards"), even though CCC had stopped paying CCC clients. The government also introduced evidence concerning Britton's experience in the collection field, which included attending a training conference and seminar designed for supervisors and managers of collection agencies. Finally, a certified public accountant testified that after reviewing the records, he concluded that CCC had failed to pay clients approximately $200,000 over the three years of Britton's active involvement with CCC.

In her defense, Britton attempted to demonstrate that the CPA's methodology was flawed. In particular, Britton argued that the CPA had failed to "set-off" for commission and costs owed to CCC by the clients. Britton argued that the amount of the fraud was far less than $200,000 because the CPA had failed to take into account commissions on direct payments made by debtors after the contracts were terminated ("post-termination collections"), and reimbursement for legal fees and court costs incurred to obtain judgments against debtors ("legal fees"). Several CCC clients testified that they had failed to pay CCC any commissions for post-termination collections and disputed that they owed CCC any legal fees.

Additionally, Britton attempted to present expert testimony from her sister, Sheryl Kobussen, to establish (1) the industry customs and practices regarding post-termination collections and (2) CCC's right to reimbursement for legal fees. Thus, Kobussen's testimony was designed to show that some of the clients owed money to CCC. The government objected to the proffered testimony on the ground that Britton had not provided notice of Kobussen's testimony under Federal Rule of Criminal Procedure 16. Britton argued that she was not required to give notice because the government failed to provide notice of its experts. Based on the government's objection regarding lack of notice, the district court precluded Kobussen from offering any opinion testimony. Britton moved for a mistrial, which was denied./2 Finally, Britton presented evidence that she attempted to repay portions of the misspent funds with her own money.

The jury convicted Britton of ten mail fraud counts and acquitted her of eleven counts, and failed to reach a verdict on two mail fraud counts and on the single embezzlement count. None of the counts on which Britton was convicted involved clients where there was evidence of post-termination collections or legal fees.

II. Analysis

Britton challenges her convictions and sentence, arguing that the evidence presented at trial was insufficient to support a finding that she intended to

defraud CCC's clients. In addition, Britton contends that the district court erred by refusing to let one of her attorneys withdraw in order to testify. Finally, Britton asserts that the district court committed reversible error by excluding Kobussen from testifying as an expert witness. We address each of Britton's claims in turn.

## A.  Sufficiency of the Evidence

The elements of mail fraud include (1) the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud; and (3) the defendant's use of the mail in furtherance of the fraudulent scheme. See United States v. Davuluri, 239 F.3d 902, 906 (7th Cir. 2001). Britton contends that the government failed to prove the intent to defraud element beyond a reasonable doubt. Intent to defraud requires a wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another. See id. As direct evidence of a defendant's fraudulent intent is typically unavailable, "specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself that demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." United States v. Paneras, 222 F.3d 406, 410 (7th Cir. 2000). Britton cannot prevail on her claim unless she demonstrates that no rational jury could have found an intent to defraud. See id.

Britton asserts that lack of business acumen, not fraudulent intent, was the reason she improperly spent client funds. Britton contends that she did not realize that she was spending clients' funds or that her actions were improper. Britton further argues that the evidence showed that she attempted to repay some of the misspent funds and that she kept track of many of the transactions, thus negating any criminal intent. However, a review of the record makes clear that Britton has not met the heavy burden she bears in making a sufficiency of the evidence argument on appeal.

The jury's conclusion that Britton knew she was spending clients' funds is

supported by Kerestes' testimony. Kerestes, a CCC employee, testified that in January 1996, she told Britton that by paying CCC business expenses out of the trust account, Britton was spending money that belonged to CCC's clients. Further, the jury's conclusion that Britton knew that her actions were improper is supported by evidence that for three years after her conversation with Kerestes, Britton continued to spend clients' funds on her personal expenses. Moreover, Britton continued to collect on clients' debts long after Britton and her husband had stopped remitting funds to these clients. More importantly, Britton continued to mail CCC payment cards to debtors-- thus encouraging debtors to send her more money--even though CCC had stopped paying clients. The evidence also clearly establishes that Britton benefitted financially from her actions, and that these benefits werecontemporaneous with her misdeeds. See id. (finding an intent to defraud when misrepresentations were contemporaneous with benefits received by defendant). This evidence is more than adequate to establish Britton's intent to defraud beyond a reasonable doubt, and we therefore conclude that Britton's sufficiency of the evidence claim fails.

B.  Denial of Motion to Withdraw

   Britton next contends that the district court erred by denying DeRango's motion to withdraw due to his conflict of interest. In the alternative, Britton contends that the district court erred by prohibiting DeRango from questioning Swanson. We have previously noted that "[d]istrict courts have been given broad discretion to fashion remedies to avoid conflicts of interest." United States v. Messino, 181 F.3d 826, 830 (7th Cir. 1999). Further, "[w]here evidence is easily available from other sources and absent 'extraordinary circumstances' or 'compelling reasons,' an attorney who participates in the case should not be called as a witness." United States v. Dack, 747 F.2d 1172, 1176 n.5 (7th Cir. 1984) (citation omitted). In Dack, the defendant subpoenaed the prosecutor to testify concerning the Supreme Court's holding in a recent case. See id. We held that the district court properly quashed the subpoena because the defendant could have easily made the same point by

entering the United States Reports into evidence. See id.

In the present case, the government contends that the district court's remedy was appropriate because DeRango's proffered testimony was easily available through another source--a billing record. DeRango's motion to withdraw was based upon knowledge that DeRango possessed and could be used to impeach government witness Swanson. DeRango told the district court that based upon his review of certain billing records, he knew that Swanson had paid his legal bill with more than $1,200 in cash. However, in his previous testimony Swanson had admitted stealing only $500 from CCC. Thus, the impeachment value of DeRango's testimony consisted of the inference that Swanson was lying when he stated he did not steal more than $500 in cash from CCC. Based on DeRango's proffer, the court denied DeRango's motion on the ground that lead counsel Cain could obtain the impeachment information through a trial subpoena of DeRango's former firm's billing records, and thus, DeRango's testimony was not necessary. We agree with the district court that the information that DeRango could have provided was easily provided by the billing record and through the cross-examination of Swanson./3 As in Dack, we see no err in the district court's actions as the testimony that DeRango sought to give was easily available through another source, and we conclude that neither "extraordinary circumstances" nor "compelling reasons" existed to find otherwise./4 We also see no problem with the district court's screening off of DeRango as we have previously approved the use of such measures in order to avoid potential ethical violations. See, e.g., United States v. Goot, 894 F.2d 231, 235-37 (7th Cir. 1990).

C.   Exclusion of Kobussen's Opinion Testimony

Finally, Britton contends that reversal is required because the district court erroneously found a Rule 16 violation and thus improperly excluded Kobussen from testifying as an expert. We review a decision to exclude expert testimony based upon a Rule 16 violation for abuse of discretion. See United States v. Yoon, 128 F.3d 515, 526 (7th Cir. 1997). Even

if we find that the district court abused its discretion, we will affirm the jury's verdict if the error is harmless. See United States v. Harvey, 117 F.3d 1044, 1048-49 (7th Cir. 1997). Under the Federal Rules of Criminal Procedure, a defendant is required to disclose her expert testimony only if: (1) the defendant asks the government to disclose its experts; (2) the government complies with the defendant's request; and (3) the government then asks the defendant to disclose her experts. See Fed. R. Crim. P. 16(b)(1)(C). On appeal, the government concedes that the second Rule 16 precondition for expert disclosure was not met, and that the district court erroneously excluded Kobussen's testimony on notice grounds. However, the government contends that the exclusion of her testimony was harmless because that testimony would only have addressed counts on which Britton was acquitted.

We faced a similar situation in United States v. Bolton, 977 F.2d 1196, 1199-1200 (7th Cir. 1992). In Bolton, the defendant was convicted of three counts of extortion, and acquitted on one count of extortion. See id. at 1198. During the trial, the judge made a series of evidentiary rulings restricting the defendant's use of photographic evidence. See id. at 1200. On appeal, the defendant argued that reversal was required because the government had violated Rule 16 in its handling of this evidence and that the judge's rulings had compounded the problems. See id. We began by noting that the evidence at issue only addressed one count of the indictment. See id. As the defendant was acquitted on that one count, we held that any error by the trial court was therefore harmless. See id.

Here, there is no dispute that Kobussen's opinion testimony only addressed a collection agency's general right to post-termination collections or legal fees. At trial, Britton presented evidence that several CCC clients owed CCC money for post-termination collections and legal fees, and Britton was acquitted of those counts. However, on the conviction counts, there was no evidence that the CCC clients associated with those counts owed CCC any post-termination collections or legal fees. Thus, because Kobussen's testimony only

addressed the counts on which she was acquitted, the exclusion of that testimony would not have affected the jury's guilty verdicts on the other counts. See id. Therefore, as in Bolton, the exclusion of her testimony was harmless. See id.

III.  Conclusion

For the forgoing reasons, the convictions of the defendant are AFFIRMED.

FOOTNOTES

/1 Dan Britton pled guilty on November 16, 2000.

/2 After the trial, Britton again raised the issue in her motion for a new trial, which was also denied.

/3 Indeed, the record indicates that Cain did obtain the billing record and then used the billing record to impeach Swanson. The transcript shows the following exchange between Cain and Swanson:

Q: Do you remember, as a matter of fact, on or about February 20th of 1996 giving your lawyer at that time who was representing you . . . a thousand dollars cash?

A: Yes.

/4 On appeal, Britton argues at length that DeRango would have testified to more than the information in the billing record. We find this argument unpersuasive as DeRango's detailed proffer to the district court makes clear that the billing record was sufficient, and any attempt to argue outside the record must be rejected. See, e.g., United States v. Hoover, 246 F.3d 1054, 1064 (7th Cir. 2001) (J. Rovner, concurring) ("We do not allow parties to stray beyond the bounds of the record for reasons so obvious and familiar that they scarcely require mention.").