In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2648

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIAM COZZI,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 276—**Blanche M. Manning**, *Judge.*

ARGUED FEBRUARY 18, 2010—DECIDED JULY 30, 2010

Before EASTERBROOK, *Chief Judge*, and KANNE and
ROVNER, *Circuit Judges.*

KANNE, *Circuit Judge.* Chicago Police Officer William
Cozzi shackled a man to a wheelchair in a hospital and
then repeatedly bludgeoned him in the head and face
with a sap.[1] He now appeals the district court's denial of

---

[1] Although the record does not contain a description of the
actual weapon that Cozzi used, a sap is generally described as
(continued...)

his motion to dismiss the indictment charging him with violating his victim's civil rights. He also appeals the district court's use of the sentencing guideline for aggravated assault rather than the guideline for civil rights violations. Neither of the issues Cozzi raises on appeal has merit. We therefore affirm Cozzi's conviction and sentence.

## I. BACKGROUND

Randle Miles was stabbed during an altercation in August 2005. He then drank heavily before an ambulance came and took him to Norwegian American Hospital in Chicago. William Cozzi, a Chicago Police Department officer, was dispatched to the scene of the altercation, but eventually made his way to the hospital to talk with Miles. Miles was apparently being loud and abusive to hospital staff, so Cozzi placed Miles under arrest, handcuffing him to a wheelchair and shackling his legs. While several witnesses looked on, Cozzi then hit Miles repeatedly with a non-police-issued sap. Cozzi later falsified a police report and misdemeanor complaints claiming that Miles had thrown punches and that Cozzi had struck Miles with his hand; he never mentioned the sap. The incident, however, was caught on tape by a

---

[1] (...continued)
"a leather-covered flat or round piece of lead with a spring handle, although it could contain lead shot rather than a solid piece of metal." Jack Lewis et al., *The Gun Digest Book of Assault Weapons* 42 (7th ed. 2007).

hospital security camera. The hospital contacted the Chicago Police Department's Office of Professional Standards ("OPS") later that month to report the incident.

OPS started an investigation the day after the hospital reported the incident. It interviewed several witnesses and obtained a copy of the video and 911 calls related to the event. On September 14, 20, and 21, 2005, OPS interviewed Cozzi. He was first given administrative rights, which compelled him to make a statement or lose his job, but which also guaranteed that his statements could not be used against him in any future criminal proceedings. Ultimately, OPS concluded that Cozzi should be terminated from the Chicago Police Department.

In December 2005, Cozzi was indicted in Cook County for aggravated felony battery and official misconduct. He pled guilty in May 2007 to a reduced misdemeanor battery charge, for which the court sentenced him to eighteen months' probation and required him to attend anger management classes. The superintendent of the Chicago Police Department filed charges in April 2006 to fire Cozzi from the police department. The Chicago Police Board held public hearings in July and August 2007 in which Cozzi was called as an adverse witness. In October 2007, the Police Board decided 6-2 to suspend Cozzi for two years rather than terminate him. His suspension was made retroactive to April 2006. The Cook County Circuit Court Chancery Division affirmed the decision in July 2008 over the city's appeal.

Former FBI agent Jody Weis was scheduled to become the Chicago Police Department's superintendent on February 1, 2008. In January 2008, Weis told the press

that he was unhappy with the Police Board's decision and promised to review Cozzi's case. That same month, Weis sent two emails to an agent in the FBI's Chicago field office, asking whether the FBI had investigated Cozzi for civil rights violations and mentioning that the former superintendent had unsuccessfully tried to fire Cozzi and that Cozzi had "falsified his statement." Weis also attached a copy of the video clip of the incident. The FBI had not yet started an investigation, but it quickly did. In April 2008, a federal grand jury indicted Cozzi on one count of violating 18 U.S.C. § 242 by depriving Miles of his right to be free from the unreasonable use of force. None of the federal prosecutors saw or reviewed Cozzi's immunized statements, and his protected statements were removed from the OPS files that were turned over to the federal grand jury.

Cozzi filed a motion in the district court seeking to have the indictment dismissed on the grounds that the government had improperly used his immunized statements in violation of *Garrity v. New Jersey*, 385 U.S. 493 (1967). The district court denied his motion, finding that no one on the prosecution team reviewed the statements and that Weis could not have had more than a "tangential influence" on the prosecution team's trial strategy. Cozzi entered a conditional guilty plea, reserving his argument under *Garrity* to appeal. He also objected to several issues regarding the applicable sentencing guidelines and calculations. The district court sentenced Cozzi to forty months' imprisonment in June 2009. This appeal followed.

## II. ANALYSIS

Cozzi argues on appeal that the district court should have dismissed the indictment because Weis's review of his protected statements and subsequent tip to the FBI constituted an improper use of his statements in violation of *Garrity*, 385 U.S. 493, and *Kastigar v. United States*, 406 U.S. 441 (1972). He also argues that the district court erred by calculating his base offense level under the guideline for aggravated assault rather than the guideline for civil rights violations.

### A. Use of Immunized Statements

We review the district court's legal conclusions *de novo* and its factual findings for clear error. *See United States v. Greve*, 490 F.3d 566, 570 (7th Cir. 2007). The Fifth Amendment, applicable to the states via the Fourteenth Amendment, provides that a person cannot be compelled to testify if in so doing he would incriminate himself. U.S. Const. amend. V. In some circumstances, however, the government may compel someone to testify, even if the testimony is incriminating, if the government gives the witness immunity. *See, e.g.*, 18 U.S.C. § 6002. This exception to the general rule against compelled self-incrimination stems in part from the Supreme Court's decision in *Garrity*, 385 U.S. 493. There, several police officers were interviewed as part of an investigation into fixing traffic tickets. The officers were faced with a daunting choice: they were free to invoke their right not to incriminate themselves, but any officer that refused to testify would lose his job. The state then used some of the officers'

testimony, over the officers' objections, in a later criminal trial. *Id.* at 494-95. The issue made its way to the Supreme Court, which held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office . . . ." *Id.* at 500.

Later, in *Kastigar*, 406 U.S. 441, the Supreme Court upheld the constitutionality of a federal immunity statute, explaining that to supplant the Fifth Amendment's privilege, the government is only required to provide "use and derivative-use immunity"—that is, that the government cannot introduce the compelled testimony into evidence at a later trial, or make derivative use of the testimony. *Id.* at 453. The Court noted that use and derivative-use immunity "prohibits the prosecutorial authorities from using the compelled testimony in any respect . . . ." *Id.* It specified that "[t]his total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." *Id.* at 460 (footnote omitted). Once the defendant shows that he made a protected statement, federal prosecutors have "the affirmative duty to prove that the evidence [they] propose[ ] to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.*

Some courts have read *Kastigar* expansively to prohibit not only the introduction of compelled testimony into evidence, but also "assistance in focusing the investiga-

tion, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." *See, e.g.*, *United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir. 1973). We, however, rejected this broad reading of *Kastigar*, opting instead for a more measured approach. *See United States v. Velasco*, 953 F.2d 1467, 1474 (7th Cir. 1992).

We held in *Velasco* that "the mere tangential influence that privileged information may have on the prosecutor's thought process in preparing for trial is not an impermissible 'use' of that information." *Id.* This approach acknowledges that "[t]he burden on the prosecution to establish an independent source for evidence against a defendant is a heavy one indeed," but that it should not be an impossible one to bear. *Id.* We re-affirmed *Velasco*'s "tangential influence" approach in *United States v. Bolton*, 977 F.2d 1196, 1199 (7th Cir. 1992). Ours is not the only circuit to adopt this approach to *Kastigar* immunity. *See, e.g.*, *United States v. Schmidgall*, 25 F.3d 1523, 1529 (11th Cir. 1994) ("[T]his Circuit has adopted the 'evidentiary' interpretation of *Kastigar*: that the focus of a challenge on self-incrimination grounds should be on the direct and indirect evidentiary uses of immunized testimony, rather [than] on non-evidentiary matters such as the exercise of prosecutorial discretion.").

Cozzi argues that the Supreme Court's decision in *United States v. Hubbell*, 530 U.S. 27 (2000), upset our "tangential influence" line of cases. In *Hubbell*, the government made several broadly worded discovery requests, with which the defendant refused to comply

because some of the documents might have been incrimi-
nating. When the government gave the defendant im-
munity "to the extent allowed by law," the defendant
provided more than 13,000 pages to the prosecutor. *Id.*
at 31. The prosecutor later prepared new charges against
the defendant based on information gleaned from the
produced documents that was previously unknown to
the prosecutor. *Id.* The Court held that the indictment
had to be dismissed because "the testimonial aspect of
respondent's act of producing subpoenaed documents
was the first step in a chain of evidence that led to this
prosecution." *Id.* at 42. Important to the Court's conclu-
sion was the fact that "[i]t was only through respondent's
truthful reply to the subpoena that the government re-
ceived the incriminating documents of which it made
substantial use . . . in the investigation that led to the
indictment." *Id.* at 42-43 (internal quotation marks and
footnote omitted) (second alteration in original).

Against this backdrop, Cozzi argues that his convic-
tion should be overturned because he claims that his
statements were improperly used against him. Cozzi's
theory on appeal of who used his statements improperly
has gradually expanded from initial briefing to oral
argument. In his initial brief, in which he had the oppor-
tunity to define the scope of the appeal, Cozzi argued
only that Weis's tip to the FBI constituted an improper
use of his protected statements. But in his reply brief,
Cozzi added a complaint that the federal prosecutors
may have been exposed to, and thus afforded the oppor-
tunity to improperly use, his protected statements be-
cause the OPS file contained references to his statements,

although the statements themselves had been removed from the file. Then, at oral argument Cozzi added the OPS investigators to his list, arguing that the government had not met its burden to show that the OPS investigators had not made improper use of his statements in conducting their investigation.

An appellant cannot raise new theories or issues in a reply brief or at oral argument, *United States v. Wescott*, 576 F.3d 347, 354 (7th Cir. 2009) (reply brief); *Holman v. Indiana*, 211 F.3d 399, 405-06 (7th Cir. 2000) (oral argument), so Cozzi has waived any complaint he may have had about the government meeting its burden regarding the federal prosecutors and OPS investigators. To the extent that Cozzi was justified in failing to mention his complaint about the federal prosecutors' exposure because certain documents were sealed until after his initial brief was due, we find that references to Cozzi's statements in the OPS files did not expose the prosecutors improperly to the content of Cozzi's protected statements. Although the OPS report does negate various aspects of Cozzi's testimony, it appears that the specific facts mentioned are derived from statements that Cozzi made in unprotected reports. The one statement that came directly from his protected statement was appropriately redacted and gives us no further cause for concern.

Turning now to Cozzi's argument regarding Weis, we find that Weis's tip to the FBI did not constitute an improper use of Cozzi's protected statement. As an initial matter, we note that the question of whether Weis reviewed Cozzi's protected statements remains unan-

swered because the government did not see fit to submit an affidavit from Weis explaining what he did or did not read. We also do not know, although we may speculate, why Weis referred Cozzi's case to the FBI. Because the government bears the burden to prove that the statements were not improperly used, we think it fair to assume for purposes of this appeal that Weis read the protected statements, and we may even assume that he was motivated to email his colleagues at the FBI because of what the protected statements contained. However, those assumptions do not end our inquiry into whether Cozzi's statements were improperly used, thus requiring us to overturn his conviction.

There is no question that *Kastigar* bars not only evidentiary use of compelled testimony but also non-evidentiary, or derivative, use of the same. At issue here is the scope of derivative-use immunity. The case law does not say that a defendant's immunized statements may never be used by anyone under any circumstances. *Garrity*, for example, clearly contemplated that the officers' compelled testimony could be used for internal investigation purposes. 385 U.S. at 500 (noting that the Fourteenth Amendment only prohibited the use of coerced statements in "subsequent criminal proceedings"). Here, there is no question that OPS was well-within the bounds of the law to compel Cozzi's testimony and use it for its own limited investigatory purposes. The question, then, is not simply whether the statements were used; rather, the constitutional guarantee that a defendant be free from compelled self-incrimination is concerned with *how* and *by whom* the statements are used.

*Kastigar* immunity is primarily concerned with the prosecutor's use of compelled testimony because it is the prosecutor who actually initiates and pursues criminal proceedings against a defendant. Thus, *Kastigar* held that use or derivative-use immunity is co-extensive with the Fifth Amendment privilege because it "prohibits *the prosecutorial authorities* from using the compelled testimony in any respect . . . ." 406 U.S. at 453 (emphasis added); *see also id.* at 462 ("We conclude that the immunity provided by 18 U.S.C. § 6002 leaves the witness and *the prosecutorial authorities* in substantially the same position as if the witness had claimed the Fifth Amendment privilege." (emphasis added)). The Court has also held that "a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials *in connection with a criminal prosecution against him*." *Murphy v. Waterfront Comm'n of N.Y.*, 378 U.S. 52, 79 (1964) (emphasis added). Cozzi appears to agree with this general proposition. (*See* Appellant's Br. at 12) ("The *prosecution* is *wholly* precluded from making any direct use, or derivative use, of compelled testimony." (first emphasis added)). The fact that the *prosecution* bears the burden to prove that all of its evidence comes from legitimate sources bolsters our understanding that the prosecution is the number-one concern of *Kastigar* immunity. *Velasco*, 953 F.2d at 1474.

Cozzi has not brought to our attention a single case where a non-prosecutor's use of a compelled statement, by itself, was held to be a violation of the defendant's

Fifth Amendment privilege. To be sure, the government has not cited any cases where a non-prosecutor's use of a compelled statement was held not to be a violation of the defendant's Fifth Amendment privilege. *But see id.* at 1474 (concluding that the prosecutor's use, if any, of protected statement was not improper). The dearth of cases in either category further supports the proposition that it is the prosecutor's use of a compelled statement that is of primary concern.

That is not to say that other individuals' use of protected statements cannot run afoul of a defendant's immunity rights. *See, e.g.*, *United States v. North*, 920 F.2d 940, 942 (D.C. Cir. 1990) ("*Kastigar* is . . . violated whenever the prosecution puts on a witness whose testimony is shaped, directly or indirectly, by compelled testimony, regardless of *how* or *by whom* he was exposed to that compelled testimony. Were the rule otherwise, a private lawyer for a witness sympathetic to the government could listen to the compelled testimony and use it to prepare the witness for trial. The government would presumably thereby gain the advantage of use of the immunized testimony so long as it did not actually cooperate in that effort."); *In re Corrugated Container Antitrust Litigation*, 644 F.2d 70, 76-77 (2d Cir. 1981) (finding that a prosecutor cannot use answers by a witness to questions posed by a *civil litigant* if those questions were derived from a protected statement). But the limits on use by non-prosecutors must be understood in terms of their relationship to the prosecutor's actions in future criminal proceedings. After all, immunity is concerned with "insur[ing] that the testimony cannot lead to the

infliction of criminal penalties on the witness." *Kastigar*, 406 U.S. at 453.

Turning now to the facts before us, Cozzi argues that Weis's tip to the FBI was an impermissible use of his protected statements because "but for" Weis's tip there would not have been a federal investigation and indictment. Cozzi argues that, like the compelled discovery documents in *Hubbell*, Weis's tip was the first step in a chain of evidence that led to criminal proceedings against him. We disagree. We find that Weis's tip alone, without communicating the substance of Cozzi's statements to federal officials, does not constitute an impermissible non-evidentiary use of the compelled statement.

We are not concerned with how *Weis* may have influenced the federal investigation, but rather how Cozzi's *statements* influenced the investigation. When framed properly, it is clear that Cozzi's statements could not have had even a tangential influence on the federal prosecutors. Weis did not tell his former colleague at the FBI what Cozzi's statements contained, and we do not think that simply saying a statement was "falsified," by itself, is enough to impute improper use of the statement to prosecutorial authorities. *Cf. Bolton*, 977 F.2d at 1199 (noting that the defendant's "denials of wrongdoing and assertions that the witnesses at the first trial had lied . . . [could not] have been much help to the prosecution"). We do not ignore that Weis's standing as a former FBI agent and as the incoming head of the Chicago Police Department most likely weighed heavily in the FBI's decision to start an investigation. But Weis's resumé does

not alter the fact the FBI had to start its investigation into Cozzi from scratch. Weis's emails, devoid of any details about Cozzi's protected statements, provided federal authorities with no evidentiary leads or other information that they could use to focus their investigation. In other words, the federal officials were "'in substantially the same position as if [Cozzi] had claimed his privilege in the absence of a grant of immunity.'" *Hubbell*, 530 U.S. at 40 (*quoting Kastigar*, 406 U.S. at 458-59). Under these circumstances, we find that whatever influence Cozzi's protected statements may have had on Weis, the government has proven that the statements played no prohibited role in the federal investigation into Cozzi or his subsequent prosecution.

We are not persuaded by Cozzi's argument that *Hubbell* compels a different outcome. We read *Hubbell* as an affirmation of the doctrine, fully explained in *Kastigar*, 406 U.S. at 460, that the government bears the burden of proving "'that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.'" *See Hubbell*, 530 U.S. at 40 (*quoting Kastigar*, 406 U.S. at 460). The prosecutors in *Hubbell* failed to meet their burden of proving that the evidence leading to the subsequent charges against the defendant did not come from a wholly legitimate source other than the defendant's protected statement. *Id.* at 44-45. The Court said that because the defendant's compelled disclosure was the first step in the chain of evidence that led to the criminal charges against him, the prosecution violated his Fifth Amendment privilege. *Id.* at 42. Nothing in the language of *Hubbell* upsets our

view of *Kastigar* immunity as explained in *Velasco* and *Bolton*.

Here, the chain of evidence was cut off between Weis and federal investigators because Weis did not communicate any of the contents of the statements in his email. What's more, in *Hubbell* it was the defendant's protected statement itself that prompted the federal investigation. Here, it was not the statement itself but a tip by a third party that prompted the investigation. As discussed above, we evaluate a non-prosecutor's use of protected testimony only as it relates to actual criminal proceedings against the defendant. Whatever role the statements might have had in motivating Weis's tip is at least one step too far removed from the actual federal investigation and prosecution to justify overturning Cozzi's conviction. On the facts before us, we conclude that the compelled statements, if they had any influence at all, could have had only a tangential influence on the federal investigation and prosecution.

Finally, we do not think that our decision today hearkens back to the now repudiated "silver platter" doctrine. That phrase arises from the practice of state law enforcement officials obtaining evidence in violation of a defendant's constitutional rights and then handing it over to federal prosecutors, who were permitted to use the evidence because they were not the wrongdoers. The practice has since been repudiated in no uncertain terms. *See Elkins v. United States*, 364 U.S. 206, 223 (1960). A tip by a third party, even one whose tip carries great weight, is not the same as handing over unconstitu-

tionally obtained evidence to the federal government to use in criminal proceedings against the defendant. We think there is a meaningful difference between Weis telling the FBI that it ought to consider investigating Cozzi and Weis telling the FBI the substance of Cozzi's protected statements. For the reasons stated above we find that the government has met its heavy, but not insurmountable, burden of proving that all of its evidence came from legitimate sources.

### B. *Applicable Sentencing Guideline*

Cozzi also argues that the district court should have used the civil rights guideline, rather than the aggravated assault guideline, to calculate the base offense level for sentencing purposes. A court sentencing a defendant guilty of violating 18 U.S.C. § 242 starts with § 2H1.1 of the sentencing guidelines. To calculate the correct base offense level, § 2H1.1 directs the court to apply the greatest of either—as applicable here—"the offense level from the offense guideline applicable to any underlying offense" or "10, if the offense involved (A) the use or threat of force against a person . . . ." Subsection (b) increases the base offense level by 6 levels "[i]f (A) the defendant was a public official at the time of the offense; or (B) the offense was committed under color of law . . . ." Application Note 1 of § 2H1.1 defines the "Offense guideline applicable to any underlying offense" as "the offense guideline applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state, or local law (other than an offense that is itself covered under Chapter Two, Part H, Subpart 1)."

The government urged the district court to use § 2A2.2 of the sentencing guidelines to calculate Cozzi's base offense level. Section 2A2.2 applies to "aggravated assault," which is defined as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; or (C) an intent to commit another felony." U.S.S.G. § 2A2.2, Application Note 1. The government argued that the conduct to which Cozzi pled guilty fell squarely within the definition of aggravated assault—namely, that Cozzi repeatedly struck Miles in the face with a sap—a dangerous weapon. The district court adopted the government's (and the pre-sentence report's) recommendation to use § 2A2.2 to calculate the base offense level.

The district court correctly applied the sentencing guidelines in calculating the appropriate sentencing range for Cozzi. The plain language of § 2H1.1 directs a court to apply the sentencing guideline applicable to the underlying offense (here, aggravated assault) if it would produce a greater base offense level than the base offense level premised solely on § 2H1.1. In this regard, § 2H1.1 "provides a floor, not a ceiling." *United States v. Byrne*, 435 F.3d 16, 27 (1st Cir. 2006). The sentencing guidelines recognize that in a situation, as here, where the defendant's conduct is more reprehensible than a civil rights violation that used a minor amount of force, the defendant's sentence should be on par with other defendants in federal court who committed similar conduct under federal jurisdiction. *Id.*

Cozzi argues that the district court's use of § 2A2.2 was also improper because there was no underlying offense due to the fact that he was only charged with and pled guilty to one count, a civil rights violation. But the fact that there is only one count in his indictment does not eliminate Cozzi's conduct—he could only violate Miles's civil rights by *doing* something. It is that something that constitutes the underlying offense for purposes of § 2H1.1, regardless of how many substantive counts with which Cozzi was charged.

Cozzi also argues that because § 2H1.1 takes into account aggravating factors, there was no need to resort to § 2A2.2. Cozzi is correct that both § 2H1.1 and § 2A2.2 could account for his underlying conduct. However, the plain language of § 2H1.1 specifically directs the district court to use the guideline that produces the greatest base offense level. Section 2A2.2 produces a higher base offense level than § 2H1.1, so the district court was correct in using the former section as a starting point for calculating Cozzi's appropriate sentencing range.

Cozzi also argues that the aggravated assault guideline was not intended to cover civil rights violations because it does not mention 18 U.S.C. § 242 as an applicable code section and a civil rights violation is not like the other substantive crimes specifically mentioned. Of course, here the cross-reference comes from the civil rights guideline and not the aggravated assault guideline. There are myriad ways to violate someone's civil rights, so as a matter of policy and economy it makes

sense to have a single, flexible cross-reference in the civil rights guideline, rather than include a reference to the civil rights guideline in every conceivable section covering conduct that might also violate a victim's civil rights.

Cozzi's argument that using the aggravated assault guideline will produce sentencing disparities between him and other civil rights violators is without merit. Section 2H1.1 is in fact designed to ensure that there are no sentencing disparities between someone who commits aggravated assault and someone who commits aggravated assault that also violates the victim's civil rights. With a view toward the underlying conduct, there is no risk that referencing the aggravated assault guideline here will result in Cozzi receiving a sentence inappropriately disparate from other similarly situated defendants.

Finally, Cozzi argues that the aggravated assault guideline does not apply to him because he only pled guilty to a misdemeanor in state court and the guideline is expressly limited to "felonious assault." It is Cozzi's conduct, however, and not his state court plea that constitutes the underlying offense for purposes of § 2H1.1. *See* U.S.S.G. § 2H1.1, Application Note 1. In his federal plea agreement, Cozzi acknowledged that he hit Miles in the face with a dangerous weapon. He can make no serious argument that the *conduct* to which he pled guilty does not constitute felonious assault, his bargain in state court notwithstanding. Accordingly, the district court did not err in finding that § 2A2.2 was applicable to Cozzi's underlying offense.

### III. CONCLUSION

There was no improper use of Cozzi's immunized statements, and the district court correctly calculated the applicable guideline range. We therefore AFFIRM Cozzi's conviction and sentence.

7-30-10