

**FILED**

Oct 13 2015, 5:38 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

John F. Kautzman
Ruckelshaus, Kautzman, Blackwell,
Bemis & Hasbrook
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Scott A. Criswell,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | October 13, 2015<br><br>Court of Appeals Case No.<br>02A03-1501-CR-22<br><br>Interlocutory Appeal from the<br>Allen Superior Court<br><br>The Honorable Richard W.<br>Karcher, Judge<br><br>Trial Court Cause No.<br>02D04-1405-CM-2055 |

**Bradford, Judge.**

# Case Summary

[1]     At all times relevant to this appeal, Appellant-Defendant Scott Criswell was a Sergeant with the Fort Wayne Police Department ("FWPD"). Criswell

attended a party at the home of another Fort Wayne police officer on August 10, 2013. While at the party, Criswell and the wives of two other Fort Wayne police officers are alleged to have forcibly entered a nearby home and removed certain items from the property. As part of a subsequent internal investigation by the FWPD, Criswell gave a statement regarding the events in question after signing a document which indicated that any statements made would not be used against him in any potential subsequent criminal action.

[2] In May of 2014, Appellee-Plaintiff the State of Indiana (the "State") charged Criswell with Class A misdemeanor criminal conversion and Class A misdemeanor criminal trespass. Criswell subsequently filed a motion to dismiss and/or suppress, arguing that the criminal charges against him should be dismissed because the charges were brought in violation of his Fifth Amendment privilege against self-incrimination, as well as the legal protections enunciated by the United States Supreme Court in *Garrity v. New Jersey*, 385 U.S. 493 (1967), and *Kastigar v. United States*, 406 U.S. 441 (1972). Alternatively, Criswell argued that his statement and any evidence derived from his statement should be suppressed. Following a hearing, the trial court denied Criswell's motion.

[3] Concluding that the trial court abused its discretion in denying Criswell's motion to suppress, we reverse the ruling of the trial court. We remand the matter to the trial court with instructions for the trial court to grant Criswell's motion to suppress his statement as well as any other evidence that was directly or indirectly derived from the statement.

# Facts and Procedural History

[4]     On August 10, 2013, Criswell attended a party at the home of FWPD Detective Scott Tegtmeyer and his wife, Heather ("Tegtmeyer"). After arriving at the party, it is alleged that Criswell went with Tegtmeyer and Patricia Sabo ("Sabo"), the wife of yet another FWPD officer, to a nearby home which was the subject of a foreclosure. Once at the home, Criswell, Tegtmeyer, and Sabo are alleged to have forcibly entered the home. They are also alleged to have removed a chainsaw and some gas cans from the property. The alleged home invasion and theft was subsequently reported to the Allen County Police Department ("ACPD"). ACPD Detective John Zagelmeier was assigned to investigate the alleged home invasion and theft.

[5]     On November 1, 2013, Russell York, the Chief of Police for the FWPD, filed a request for an internal investigation into the events that occurred on August 10, 2013. Before Criswell agreed to cooperate with the internal investigation, Criswell was presented with a document entitled "GARRITY NOTICE" which read as follows:

> You are being questioned as part of an official internal affairs investigation by the [FWPD]. You will be asked questions specifically directed and related to the performance of your official duties or fitness for office. You are entitled to all the rights and privileges guaranteed by the laws of the Constitution of this State and the Constitution of the United States and the applicable collective bargaining agreements with the City of Fort Wayne. If you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty you will be subject to departmental charges that could result in your

dismissal from this agency. Your statements and any information or evidence that is gained by reason of such statements cannot be used against you in any subsequent criminal proceedings, (except for perjury or obstruction of justice charges). These statements may be used against you in relation to subsequent departmental charges. The fruits of this investigation may be disclosed in civil litigation.

Defendant's Collective Exhibit, Exhibit B. Criswell signed the GARRITY NOTICE, agreed to participate in an internal affairs interview, and gave a compelled statement.

[6] During Criswell's internal affairs interview, which was conducted by FWPD Sergeant Jim Seay, the following exchange took place:

> Sgt. Seay: Okay, Sergeant Criswell, have you had the opportunity to read your Garrity Rights?
> Sgt. Criswell: Yes sir.
> Sgt. Seay: Okay. And have you had the opportunity to read the allegation against you?
> Sgt. Criswell: Yes sir.
> Sgt. Seay: Okay. And you understand you're being ordered to answer the questions truthfully?
> Sgt. Criswell: Yes sir.
> Sgt. Seay: Okay. And you're waiving your right to any union or legal representation at this time?
> Sgt. Criswell: Yes sir.
>
> ****
>
> St. Seay: The allegation, as you know, is a [sic] Administrative Felony, which means that the, we've had, I guess I'd call it hearsay at this point, that you're involved in [an] activity that might be considered a felony if it were investigated criminally. It stems from a, going into a house while you were at

[a] party that happened earlier this year.  I think it was the second week of August.

Sgt. Criswell:        I believe so.  I was trying to figure out the date.  In the … I believe the letter said August 10.

Defendant's Collective Exhibit, Exhibit C (last ellipsis in original).

[7]    Although he initially suspected the victim's ex-husband, Detective Zagelmeier eventually learned of Criswell's potential involvement in the alleged home invasion and theft.  As part of Detective Zagelmeier's investigation, the State requested a subpoena for the production of:

> ANY AND ALL INFORMATION PERTAINING TO the internal affairs investigation involving Ed Sabo (Patricia Sabo), Scott Criswell, and Scott Tegtmeyer (Heather Tegtmeyer) for an incident from 8/10-8/11, 2013 in the 8600 block of Frazier Road, Allen County.  These records should include all reports, any other documents, and copies of interviews.

Defendant's Collective Exhibit, Exhibit D.  The trial court granted the State's request.

[8]    On May 24, 2014, the State charged Criswell with Class A misdemeanor criminal conversion and Class A misdemeanor criminal trespass.  On August 11, 2014, Criswell filed a motion to dismiss and/or suppress, arguing that the criminal charges against him should be dismissed because the charges were brought in violation of his Fifth Amendment privilege against self-incrimination, as well as the legal protections enunciated by the United States

Supreme Court in *Garrity* and *Kastigar*. Following a hearing, the trial court denied Criswell's motion. This interlocutory appeal follows.

# Discussion and Decision

[9] Again, Criswell filed a motion before the trial court which requested that the trial court dismiss the charges brought against him or, alternatively, suppress any and all evidence derived from his compelled statement. On appeal, Criswell contends that the trial court erred in denying this motion. Specifically, Criswell contends that the trial court erred in denying his motion in light of the Supreme Court's decision in *Garrity*. For its part, the State argues that the trial court properly denied Criswell's motion because *Garrity* does not apply to the instant matter. The State alternatively argues that even if *Garrity* applies, the trial court properly denied Criswell's motion because it met its requirement of proving that it had an independent, legitimate source for the evidence at issue.

## I. Standard of Review

[10] "We review a trial court's denial of a motion to dismiss for an abuse of discretion." *Lebo v. State*, 977 N.E.2d 1031, 1035 (Ind. Ct. App. 2012) (citing *Delagrange v. State*, 951 N.E.2d 593, 594 (Ind. Ct. App. 2011), *trans. denied*). Likewise, the admissibility of evidence is within the sound discretion of the trial court, and we will not disturb the decision of the trial court absent a showing of abuse of that discretion. *Smith v. State*, 780 N.E.2d 1214, 1216 (Ind. Ct. App. 2003) (citing *Gibson v. State*, 733 N.E.2d 945, 951 (Ind. Ct. App. 2000)). Accordingly, in both situations we will reverse a trial court's ruling on the

admissibility of evidence only when the trial court abused its discretion. *Washington v. State*, 784 N.E.2d 584, 587 (Ind. Ct. App. 2003) (citing *Bradshaw v. State*, 759 N.E.2d 271, 273 (Ind. Ct. App. 2001)). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id.* (citing *Huffines v. State*, 739 N.E.2d 1093, 1095 (Ind. Ct. App. 2000)).

[11] Further, we review the denial of a motion to suppress in a manner similar to other sufficiency matters. *Overstreet v. State*, 724 N.E.2d 661, 663 (Ind. Ct. App. 2000), *trans. denied*. We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Id.* However, unlike the typical sufficiency of the evidence case where only the evidence favorable to the judgment is considered, we must also consider the uncontested evidence favorable to the defendant. *Id.*

## II. Overview of *Garrity* and its Progeny

[12] In *Garrity*, the United States Supreme Court considered a case involving police officers who were being investigated for allegedly fixing traffic tickets. 385 U.S. at 494. Before being questioned, each of the officers involved was warned that anything he said might be used against him in potential subsequent state criminal proceedings, that he had the privilege to refuse to answer if the disclosure would tend to incriminate himself, but that if he refused to answer, he would be subject to removal from office. *Id.* Each of the officers then answered the investigators' questions without being granted immunity. *Id.* at

495. Some of the officers' responses to the investigators' questions were indeed used against the officers in subsequent criminal prosecutions for conspiracy to obstruct the administration of traffic laws. *Id*. The officers were convicted and their convictions upheld despite the officers' assertions that "their statements were coerced, by reason of the fact that, if they refused to answer, they could lose their positions with the police department." *Id*. (footnote omitted).

[13] Upon review, the Supreme Court noted as follows:

> The choice given [the officers] was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in *Miranda v. State of Arizona*, 384 U.S. 436, 464-465, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694, is 'likely to exert such pressure upon an individual as to disable him from making a free and rational choice.' We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.

*Id*. at 497-98 (footnote omitted). The Supreme Court further noted that the question before the Court was whether a State, contrary to the requirement of the Fourteenth Amendment, could use the threat of discharge to secure incriminatory evidence against an employee. *Id*. at 499. Concluding that policemen were not relegated to a watered-down version of constitutional rights, the Supreme Court stated that "[t]here are rights of constitutional stature whose exercise a State may not condition by the exaction of a price." *Id*. at 500. The Supreme Court went on to state the following:

We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic.

*Id*.

[14] In *Atwell v. Lisle Park District*, 286 F.3d 987 (7th Cir. 2002), the United States Court of Appeals for the Seventh Circuit (the "Seventh Circuit") reiterated that

> The government is not allowed to force a person to make a statement, even out of court, that might be used as evidence that he had committed a crime. It is not even allowed to pressure him into cooperating by threatening to fire him (if he's a government employee) for his refusing to provide such evidence. *Gardner v. Broderick*, 392 U.S. 273, 276, 278-79, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); *Chan v. Wodnicki*, 123 F.3d 1005, 1009 (7th Cir. 1997); *Lenard v. Argento*, 699 F.2d 874, 896 (7th Cir. 1983). It has every right to investigate allegations of misconduct, including criminal misconduct by its employees, and even to force them to answer questions pertinent to the investigation, but if it does that it must give them immunity from criminal prosecution on the basis of their answers. *Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977); *Gardner v. Broderick*, *supra*, 392 U.S. at 276, 88 S.Ct. 1913; *Chan v. Wodnicki*, *supra*, 123 F.3d at 1009. Nor can the federal government use those answers to assist it in its own prosecution of the person. *Murphy v. Waterfront Commission*, 378 U.S. 52, 79-80 and n. 18, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964); *United States v. Balsys*, 524 U.S. 666, 683, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998).

*Atwell*, 286 F.3d at 990. The Seventh Circuit has also reiterated that the government bears the burden of proving "that the evidence it proposes to use is

derived from a legitimate source wholly independent of the compelled testimony." *U.S. v. Cozzi*, 613 F.3d 725, 732 (7th Cir. 2010) (internal quotations omitted); *see also Kastigar*, 406 U.S. at 460.

## III.  Whether *Garrity* Applies to the Instant Matter

At the outset, it is important to note the "well-settled rule that men and women do not surrender their freedoms when joining the police force." *Driebel v. City of Milwaukee*, 298 F.3d 622, 637 (7th Cir. 2002).

> We have previously commented that "[a] trustworthy police force is a precondition of minimal social stability in our imperfect society," *Shields v. Burge*, 874 F.2d 1201, 1204 (7th Cir. 1988), and that "[t]he public, including fellow law enforcement agents, expects that police officers will not violate the laws they are charged with enforcing." *United States v. Lamb*, 6 F.3d 415, 419 (7th Cir. 1993).

*Id*. at 638.  However,

> "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." [*Garrity*, 385 U.S. at 500].  At the same time, we hasten to emphasize that nothing in the Fourth Amendment endows public employees with greater workplace rights than those enjoyed by their counterparts in the private sector.  Thus, in cases involving the constitutional rights of police officers, courts must distinguish between a police department's actions in its capacity as an employer and its actions as the law enforcement arm of the state.  *See* [*Lefkowitz*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1]; *Uniformed Sanitation Men Ass'n v. Commissioner*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); [*Gardner*, 392 U.S. 273]; *Garrity*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562; [*Atwell*, 286

F.3d 987]; *Confederation of Police v. Conlisk*, 489 F.2d 891 (7th Cir. 1973).

*Id.* at 637.

## A. Overview of Limitations on Application of *Garrity*

### 1. *Garrity Not Implicated When the Threat of Severe Employment Sanctions Is Too Conditional*

In *United States v. Palmquist*, 712 F.3d 640 (1st Cir. 2013), the United States Court of Appeals for the First Circuit (the "First Circuit") acknowledged that *Garrity* provides that "[w]hen an employee faces the choice 'between self-incrimination and job forfeiture,' the Court ruled, his statements are deemed categorically coerced, involuntary, and inadmissible in subsequent criminal proceedings." *Palmquist*, 712 F.3d at 645 (quoting *Garrity*, 385 U.S. at 496-97). However, the First Circuit held that "*Garrity* immunity is contingent upon the degree of certainty that an employee's silence alone will subject the employee to severe employment sanctions." *Id.* The First Circuit explained that "[s]o, for example, potentially unfavorable inferences drawn from an employee's silence, which serve as one factor in adverse employment action against him, have been found 'too conditional' a threat to trigger *Garrity* immunity. *Id.* (quoting *U.S. v. Stein*, 233 F.3d 6, 14 & 16 (1st Cir. 2000) (distinguishing "the threat of automatic loss of one's livelihood and the threat of an inference that might lead to such a loss")).

In *Palmquist*, the notice signed by the employee read as follows:

> If you refuse to answer the questions posed to you on the grounds that the answers may tend to incriminate you, you cannot be removed (fired) solely for remaining silent; however, your silence can be considered in an administrative proceeding for any evidentiary value that is warranted by the facts surrounding your case.

712 F.3d at 644. Upon review of the facts presented before the court on appeal, the First Circuit found that nothing said or presented to the Appellant "could have led [the Appellant] to believe that, if he remained silent, he would automatically lose his job or suffer similarly severe employment consequences solely for having remained silent." *Id*. at 645. The First Circuit also noted that the Advisement of Rights that was presented to the Appellant expressly informed the Appellant "that he could not be fired solely for refusing to participate in the interview, although his silence could be used as evidence in an administrative proceeding." *Id*. The First Circuit concluded that "the consequences of such a use of [the Appellant's] silence are too conditional to be deemed coercive, and, as a result, *Garrity* did not apply. *Id*.

### 2. *Garrity Not Implicated When Subjected to Dismissal after Refusing to Answer Questions Relating to Performance of Official Duties*

In *Uniformed Sanitation Men* and its companion case, *Gardner*, the Supreme Court held it does not violate *Garrity* when, after proper proceedings, public employees are subjected to dismissal for refusing to account for their performance of their official duties so long as the proceedings did not involve an attempt to coerce the public employees to relinquish their constitutional rights against self-incrimination in potential future criminal proceedings. *See*

*Uniformed Sanitation Men*, 392 U.S. at 284-85. Stated differently, it does not violate *Garrity* if public employees are subjected to dismissal for refusing to account for their performance so long as the public employees are not required to waive their immunity with respect to the use of their answers or the fruits thereof in a future criminal prosecution. *See Gardner*, 392 U.S. at 278. In reaching this conclusion, the Supreme Court provided as follows:

> As we stated in [*Gardner*, 392 U.S. at 278], if New York had demanded that petitioners answer questions specifically, directly, and narrowly relating to the performance of their official duties on pain of dismissal from public employment without requiring relinquishment of the benefits of the constitutional privilege, and if they had refused to do so, this case would be entirely different. In such a case, the employee's right to immunity as a result of his compelled testimony would not be at stake. But here the precise and plain impact of the proceedings against petitioners as well as of s 1123 of the New York Charter was to present them with a choice between surrendering their constitutional rights or their jobs. Petitioners as public employees are entitled, like all other persons, to the benefit of the Constitution, including the privilege against self-incrimination. [*Gardner*, 392 U.S. at 277-78]; [*Garrity*, 385 U.S. at 500]. *Cf.* [*Murphy*, 378 U.S. at 79]. At the same time, petitioners, being public employees, subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights.

*Uniformed Sanitation Men*, 392 U.S. at 284-85.

[20] The holdings in *Uniformed Sanitation Men* and *Gardner* were reiterated by the United States Court of Appeals for the Fourth Circuit (the "Fourth Circuit") in

*Wiley v. Mayor and City of Baltimore*, 48 F.3d 773 (1995).  In *Wiley*, the Fourth Circuit stated that "the state may compel job-related testimony from an employee in the course of a criminal investigation, provided, of course, that the state does not make direct or derivative use of the employee's statement against the employee in any criminal proceeding."  *Id*. at 777.

## B. Analysis

[21] Again, before answering any questions relating to the events that occurred on August 10, 2013, Criswell signed a document entitled "GARRITY NOTICE."  Defendant's Collective Exhibit, Exhibit B.  The GARRITY NOTICE read as follows:

> You are being questioned as part of an official internal affairs investigation by the Fort Wayne Police Department.  You will be asked questions specifically directed and related to the performance of your official duties or fitness for office.  You are entitled to all the rights and privileges guaranteed by the laws of the Constitution of this State and the Constitution of the United States and the applicable collective bargaining agreements with the City of Fort Wayne.  *If you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty you will be subject to departmental charges that could result in your dismissal from this agency*.  Your statements and any information or evidence that is gained by reason of such statements cannot be used against you in any subsequent criminal proceedings, (except for perjury or obstruction of justice charges).  These statements may be used against you in relation to subsequent departmental charges.  The fruits of this investigation may be disclosed in civil litigation.

Defendant's Collective Exhibit, Exhibit B (emphasis added). After signing the GARRITY NOTICE, Criswell agreed to participate in an internal affairs interview.

[22] The State claims that, similar to *Palmquist*, *Garrity* should not apply to the instant matter because the above-quoted language was too conditional to be deemed coercive as it did not indicate that if Criswell remained silent, Criswell would automatically lose his job or suffer similarly sever employment consequences. Again, in *Palmquist*, the notice signed by the employee expressly stated that the employee could not be fired solely for remaining silent. 712 F.3d at 644. This was an important factor considered by the First Circuit in reaching its determination that nothing said or presented to the Appellant "could have led [the Appellant] to believe that, if he remained silent, he would automatically lose his job or suffer similarly severe employment consequences solely for having remained silent." 712 F.3d at 645.

[23] Unlike the notice signed by the employee in *Palmquist*, the language of the GARRITY NOTICE signed by Criswell expressly stated that a refusal to testify would subject Criswell to departmental charges that could result in termination of his employment. Again, the language of the GARRITY NOTICE signed by Criswell indicated that "[i]f you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty you *will be subject to departmental charges that could result in your dismissal from this agency.*" Defendant's Collective Exhibit, Exhibit B (emphasis added). This language is more definitive than the language at issue in *Palmquist*, and is sufficient to lead

Criswell to believe that he would lose his job or suffer similarly severe employment consequences if he were to remain silent.

[24] Alternatively, the State claims that *Garrity* should not apply because Criswell "was never asked to waive his Fifth Amendment privilege." Appellant's Br. p. 19. While the record might not include proof of an explicit request that Criswell waive his Fifth Amendment privilege, one may arguably infer from the record that Criswell was, at least implicitly, asked to waive his Fifth Amendment privileges and that he did so when he agreed to sign the GARRITY NOTICE and to cooperate with the internal investigation.

[25] The State points to language contained in the GARRITY NOTICE signed by Criswell that explicitly states that Criswell's statements "and any information or evidence that is gained by reason of such statements cannot be used against you in any subsequent criminal proceedings" as proof that Criswell did not waive his Fifth Amendment privilege. Defendant's Collective Exhibit, Exhibit B. However, contrary to the State's assertion, it seems to us that this language supports the opposite inference, *i.e.*, that Criswell did waive his Fifth Amendment privilege after being assured that any incriminating statements he made could not be used against him in any subsequent potential criminal action. It is also of intrigue that, arguably, the State is trying to do exactly what the notice prohibits, *i.e.*, use information or evidence gained or derived from Criswell's statements against him in subsequent criminal proceedings. Again, this is the exact state action which *Garrity* protects against.

In sum, the record reveals that Criswell participated in the internal affairs interview after being (1) notified that his failure to cooperate could result in the termination of his employment and (2) assured, in writing, that any statements he made could not be used against him in any potential subsequent criminal proceedings. Upon review, we conclude that *Garrity* applies to the instant matter.[1] Accordingly, we conclude that the trial court abused its discretion in denying Criswell's motion to suppress his statement.

## III. Whether the State's Evidence is Wholly Independent of Criswell's Statement

Criswell also contends that the State failed to prove that the evidence it intends to present at trial is wholly independent of his statement. Specifically, Criswell argues that State's act of exposing Tegtmeyer and Sabo to the information from Criswell's compelled statement during their interviews with Detective Zagelmeier completely and utterly taints any future testimony by these witnesses. For its part, the State argues that it met its burden of proving that its evidence either was, or would have been, discovered independently of

---

[1] We note that although the State argued on appeal that *Garrity* does not apply to the instant matter, the State arguably conceded before the trial court that *Garrity* applied. In responding to Criswell's motion to dismiss/suppress, the State stated that "The State admits that, pursuant to [*Garrity*], Defendant's own statement made in the course of an internal affairs investigation (hereinafter "I.A. statement") cannot be used against him in this criminal proceeding." Appellant's Supp. App. p. 32. Additionally, during the October 16, 2014 hearing on Criswell's motion, the State indicated that the question before the trial court was not whether *Garrity* applied to Criswell's statement to Sergeant Seay but rather "just how far does *Garrity* go." Tr. p. 14.

Criswell's compelled statement. In support, the State claims that the record demonstrates that it had knowledge of the identity of the participants prior to the date that it sought to subpoena the internal investigation records, and employed a logical, natural, and routine course when interviewing Tegtmeyer and Sabo.

## A. Overview of Law Relating to Whether Evidence Is Found to Have Been Derived from a Wholly Independent Legitimate Source

[28] In *Kastigar*, the Supreme Court noted that the Fifth Amendment privilege against self-incrimination "has never been construed to mean that one who invokes it cannot subsequently be prosecuted." 406 U.S. at 453.

> Its sole concern is to afford protection against being forced to give testimony leading to the infliction of penalties affixed to . . . criminal acts. Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in any respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.

*Id*. (footnote and internal quotation marks omitted).

[29] Again, in cases where *Garrity* applies, the government bears the burden of proving "that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Cozzi*, 613 F.3d at 732 (internal quotations omitted); *see also Kastigar*, 406 U.S. at 460. The Seventh

Circuit discussed the government's burden in this regard in *United States v. Velasco*, 953 F.2d 1467 (7th Cir. 1992). In *Velasco*, the Seventh Circuit held as follows:

> The burden on the prosecution to establish an independent source for evidence against a defendant is a heavy one indeed, but we decline to make it an impossible one to bear. We adopt the position of [*United States v. Mariani*, 851 F.2d 595 (2d Cir. 1988)], and cases following, that the mere tangential influence that privileged information may have on the prosecutor's thought process in preparing for trial is not an impermissible "use" of that information. *United States v. Schwimmer*, 924 F.2d 443, 446 (2d Cir.), *cert. denied*, 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 31 (1991) (citing *Mariani*, 851 F.2d at 600). *See also United States v. Rivieccio*, 919 F.2d 812, 815 (2d Cir. 1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991); [*United States v. Serrano*, 870 F.2d 1, 17-18 (1st Cir. 1989)].

953 N.E.2d at 1474. The Seventh Circuit has further held:

> There is no question that *Kastigar* bars not only evidentiary use of compelled testimony but also non-evidentiary, or derivative, use of the same. At issue here is the scope of derivative-use immunity. The case law does not say that a defendant's immunized statements may never be used by anyone under any circumstances. *Garrity*, for example, clearly contemplated that the officers' compelled testimony could be used for internal investigation purposes. 385 U.S. at 500, 87 S.Ct. 616 (noting that the Fourteenth Amendment only prohibited the use of coerced statements in "subsequent criminal proceedings").

*Cozzi*, 613 F.3d at 730.

There is no question that the FWPD was well within the bounds of the law to compel Criswell's testimony and use it for its own limited internal investigation. "The question, then, is not simply whether the statements were used; rather, the constitutional guarantee that a defendant be free from compelled self-incrimination is concerned with *how* and *by whom* the statements are used." *Id*. (emphases in original).

## B. Analysis

[31] The offense report compiled by ACPD Detective Zagelmeier indicates that on October 31, 2013, Detective Zagelmeier was advised by Detective Geray Farrell "to make contact with Capt. Dave Nelson of the [FWPD]'s Internal Affairs Division on November 1, 2013 regarding an incident involving some FWPD officers and a possible burglary." Defendant's Collective Exhibit, Exhibit E. The report further indicates that On November 1, 2013, Detective Zagelmeier met with Captain Nelson who advised that

> his office had received information that a group of officers had a party at the home of FWPD Detective Scott Tegtmeyer…. During the course of the party, it was mentioned by either Tegtmeyer or his wife that an unoccupied house down the road was being foreclosed on by the bank. The information received by Capt. Nelson was that … Tegtmeyer's wife, another unknown female and FWPD Sgt. Scott Criswell went to the residence in question to look at it. While there it was reported that Criswell tried to open the door of the residence and the door was unlocked, but chained from the inside. Capt. Nelson reported Tegtmeyer's wife then said, "that's not how you open a door" and kicked the door open. Capt. Nelson stated he was told that when Criswell, Tegtmeyer's wife and the second female returned

to the party at the Tegtmeyer residence, there was a chain saw and two gas cans in the back of the ATV. Capt. Nelson reported that Detective Tegtmeyer became very upset with Criswell and his wife and ended up returning the chain saw and gas cans to the residence the next day. Capt. Nelson stated that Tegtmeyer's wife and the other female told partygoers that Criswell had taken the items and Criswell reported that the women had taken the items.

Defendant's Collective Exhibit, Exhibit E.

[32] Detective Zagelmeier's offense report indicates that the State was made aware of Criswell's and Tegtmeyer's potential participation in the burglary of the home in question on November 1, 2013. Criswell's internal investigation interview was not completed until November 8, 2013. Also, Detective Zagelmeier learned the identity of Sabo, *i.e.*, the previously unidentified female, on or about November 15, 2013. The State argues that it is significant that it learned Tegtemeyer's and Sabo's identities through information provided independently of Criswell's interview because both women subsequently gave accounts of the events in question. The State further argues that it is also significant that Detective Zagelmeier was aware of the identity of each of the alleged participants approximately two months before the State requested a subpoena for the production of "any and all" information pertaining to the internal investigation into the incident. Defendant's Collective Exhibit, Exhibit D.

[33] On March 27, 2014, Detective Zagelmeier interviewed both Tegtemeyer and Sabo. Criswell claims that each of the women's interviews was "rife with

phrasing, guidance and steering of the interview with information that could only have been learned" from Criswell's compelled statement. Appellant's Br. p. 16. Criswell asserts that it is apparent from the video recordings of these interviews that Detective Zagelmeier is reviewing the transcript of Criswell's compelled statement at various points throughout both interviews. Criswell also asserts that there are ten direct, unambiguous questions or statements posed to Tegtemeyer and fourteen direct, unambiguous questions or statements posed to Sabo that could have been obtained from "no other source than" Criswell's compelled statement. Appellant's Br. p. 17. Thus, Criswell claims that "[w]ithout doubt," Tegtmeyer's and Sabo's testimony were shaped "both directly and indirectly by information learned from" Criswell's compelled statement and that "[t]his exposure to the information from [Criswell's compelled statement] completely and utterly taints any future testimony by these witnesses, and the fair use of these witnesses by the Prosecutor." Appellant's Br. p. 17.

[34] For its part, the State claims that Detective Zagelmeier's questioning during each woman's interview followed a natural and logical course of determining who did what, who spoke, and who saw or heard the others speak or act. The State asserts that Detective Zagelmeier interviewed both Tegtmeyer and Sabo for a significant amount of time, forty minutes and thirty-eight minutes, respectively. From these lengthy interviews, Criswell only points to ten instances where Detective Zagelmeier used Criswell's compelled statement in questing Tegtmeyer and fourteen instances where Detective Zagelmeier used

Criswell's compelled statement in questioning Sabo. The State claims that these were routine police interviews during which the subjects voluntarily related their own knowledge without reference to anything that Criswell said to Sergeant Seay. The State further claims that it had other sources for the information that cannot be found to be derived from or connected to Criswell's compelled statement. Thus, the State claims the independent and routine nature of the interviews underscores its argument before the trial court that a denial of Criswell's motion was proper because under *Kastigar*, a defendant's immunity extends no further than the prosecutor's use of a defendant's statement.[2]

[35] Criswell responds to the State's claims and assertions by arguing that the questioning of Tegtmeyer and Sabo did not follow the "natural and logical course" of a routine investigation because Detective Zagelmeier was able to shape each interview to corroborate the facts he had already learned from Criswell's statement and to find new facts that he knew would be needed to

---

[2] The State also appears to argue that its evidence should be found to be independent of Criswell's compelled statement because "Detective Zagelmeier was not investigating Criswell; he was investigating a potential burglary and theft occurring during the Tegtmeyer party and committed by Heather Tegtmeyer, Patricia Sabo, or Criswell" and that Detective Zagelmeier's "entire investigation was conducted under the original case" which was opened when the theft was first reported in September of 2013. Appellee's Br. p. 22. However, contrary to the State's claim it seems that Detective Zagelmeier was investigating Criswell, Tegtmeyer, and Sabo as he had received information that they had committed burglary and/or theft. Further, it seems unclear what difference it makes as to whether Detective Zagelmeier investigated the matter under the "original case" or opened a new case. In the end, the result is the same, *i.e.*, that Detective Zagelmeier completes an investigation into who burgled the home in question.

secure a conviction against Criswell. Appellant's Reply Br. p. 14. Criswell further argues that "[i]n a typical investigation, a detective would not have the benefit of a 30-page long statement from a defendant who has exercised his Fifth Amendment privilege." Appellant's Reply Br. p. 14. Criswell asserts that Detective Zagelmeier's claim that he would have interviewed Tegtmeyer and Sabo regardless of whether he read Criswell's statement does not forgive the violation of the Supreme Court's holdings in *Garrity* and *Kastigar*. Criswell further asserts that the fact that Detective Zagelmeier waited to interview Tegtmeyer and Sabo until after he had Criswell's compelled statement suggests that there was value in using the compelled statement in conducting the interviews.

[36] Criswell also argues that the State overstated how much it knew about Criswell's involvement in the incident before obtaining and reviewing his compelled statement. Specifically, Criswell claims that the State did not know whether he had entered the home before obtaining and reviewing his compelled statement. In support of this claim, Criswell points to the charging informations filed by the State, both of which list the internal affairs investigator and interviewer as a potential witness. Criswell also points to the ACPD's evidence sheets which indicate that the evidence file relating to the instant matter contained two items: (1) a media disk containing audio recordings of the internal affairs interviews conducted in relation to the instant matter, and (2) a media disk containing recordings of Tegtmeyer's and Sabo's interviews. Criswell additionally claims that prior to obtaining and reviewing his compelled

statement, Detective Zagelmeier continued to investigate the homeowner's ex-husband as a possible responsible party.

[37] Having determined that Criswell's statement to Sergeant Seay should be suppressed, the question becomes whether the evidence the State intends to present during trial is wholly independent of Criswell's suppressed statement. If the evidence was derived either directly or indirectly from Criswell's suppressed statement, it too must be suppressed as it would be considered fruit of the poisonous tree. However, if the evidence was not derived from Criswell's suppressed statement, it could, barring any other potential successful objections to its admission, be admissible at trial.

[38] Since the admission of evidence falls within the sound discretion of the trial court, we conclude that the proper path to follow in the instant matter is to remand the matter to the trial court. On remand, we instruct the trial court to conduct a "*Kastigar* hearing" during which the trial court closely examines whether any portions of (1) Tegtmeyer's statement, (2) Sabo's statement, or (3) any other evidence which the State intends to submit at trial was derived, directly or indirectly, from Criswell's statement. We further instruct the trial court that any evidence that is determined to be derived directly or indirectly from Criswell's statement must also be suppressed.

[39] The judgment of the trial court as to Criswell's motion to suppress is reversed and the matter is remanded to the trial court with instructions.

Vaidik, C.J., and Crone, J., concur.